## MURPHY ₀ LABORATORIES, Inc.   v. EMERY INDUSTRIES, Inc.

### Civ. No. 7945.

United States District Court
E. D. Pennsylvania.
Feb. 9, 1951.

Reilly & Pearce, Upper Darby, Pa., (Albert H. Pearce, Upper Darby, Pa.), for plaintiff.

Drinker, Biddle & Reath, Philadelphia, Pa., (Charles J. Biddle and Lewis H. Van Dusen, Jr., Philadelphia, Pa.), for defendant.

FOLLMER, District Judge.

This is an action for damages for breach of warranty. This case was tried before the Court, without a jury, and the parties were represented by counsel. Based upon the oral testimony, exhibits, documentary evidence and admissions of the parties by their pleadings and in open Court, and in compliance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law as follows:

## Findings of Fact

1. Murphy Laboratories, Inc., (hereinafter referred to as "Murphy") a Pennsylvania corporation with its principal place of business at Clifton Heights, Delaware County, Pennsylvania, was, at all times pertinent herein, engaged in the manufacture of pine jelly soap.

2. Emery Industries, Inc., (hereinafter referred to as "Emery") an Ohio corporation with its principal place of business at Cincinnati, was, at all times pertinent herein, engaged in the manufacture of chemicals, among which are various types of oleic acid.

3. Pine jelly soap is a soft jelly like substance used for household and commercial cleaning purposes.

4. Beginning in the Fall of 1945, Emery sold to Murphy an oleic acid known as Emery 0–20, which the latter used for approximately one year in the making of its pine jelly soap, apparently with complete satisfaction.

5. This acid was made from the fat of animals which by the late Summer of 1946 became increasingly scarce, in consequence whereof Murphy bought other kinds of oleic acids from Emery, which it mixed with 0–20 in the making of its soap, again with apparently satisfactory results.

6. During the month of September 1946, Ritz, the Philadelphia sales representative of Emery, brought to Murphy's attention an Emery oleic acid product known as 0–442 which was available, whereupon Murphy agreed that Ritz should send it a trial order.

7. Emery shipped to Murphy, by invoice dated September 25, 1946, five drums of 0–442, and by invoice dated October 7, 1946, three drums of 0–442.

8. The 0–442 grade of oleic acid was made from vegetable sources.

9. Ritz did not know the formula which Murphy used in the manufacture of its pine jelly soap.

10. Murphy used the trial order of 0–442, and by invoice dated October 8, 1946, purchased a tank car of 8000 gallons of the same product at a cost of $9,303.47, which was paid October 31, 1946.

11. Thereafter the following purchases of 0–442 were made of Emery by Murphy,

Invoice dated November 14, 1946, 35 drums $4,469.44
Invoice dated January 6, 1947, 20 drums 2,558.24
Invoice dated January 31, 1947, 15 drums 1,906.66,

all of which were paid respectively on November 27, 1946, April 15, 1947, and April 30, 1947.

12. Approximately thirty to sixty days after using 0–442, or about the middle of November 1946, Murphy began to get complaints from its customers that its soap was separating so that a substance collected at the top of the containers.

13. On or about February 7, 1947, Murphy through its duly authorized agents, John W. Murphy and Leslie W. Stirk, orally contracted with Emery through its duly authorized agent, James W. Ritz, for the purchase of fifty drums of 0–442 at an agreed purchase price of 30¼ cents per pound.

14. The fifty drums of 0–442 were shipped by Emery by invoice dated February 7, 1947, the contents weighed 21,198 pounds, and the agreed purchase price thereon was $6,412.40. The shipment was delivered to Murphy at Clifton Heights, Pennsylvania, on February 11, 1947. The terms of payment indicated on the invoice were less one per cent. in ten days, thirty days net.

15. Under date of March 13, 1947, Murphy wrote to Emery at the latter's Cincinnati office as follows:

"I am writing you in reference to our account. At the present time our plant is not operating, due to conditions beyond our control. Our customers, having overbought, are now in the process of reducing their present inventories. As a result we are, at the present, here with over a $7,000. stock of your material—plus 6,000 cases of finished material ready for shipment. Therefore, our raw material stock, at the present time, is just taking up space.

"We, however, have a brighter future as the customers stocks are almost ex-

hausted now and we are also coming into our best period of the year 'house cleaning'. So it is only a matter of a few weeks until things will roll again.

"We are very much concerned about our account with you and if we could possibly sell this raw material at the price we paid for it, we would do so and remit the amount to you immediately.

"In closing, Mr. McGilliard, I wish to ask you to bear with us for just a short time and I am sure that you will be compensated for it. We will certainly appreciate it to the utmost.

"Thanking you for your patience in the past, I remain

Yours very truly,
John W. Murphy.
John W. Murphy
President."

16. On April 28, 1947, J. W. Murphy complained to J. W. Ritz that the 0-442 had caused a separation of his soap.

17. Under date of May 19, 1947, Murphy wrote to Emery, at the latter's Cincinnati office, as follows:

"We have always been a user of your product 'Olive Elaine'. However, in November of 1946 we accepted a tank car of your product called 0442 which your representative stated would take the place of Olive Elaine in the manufacture of our product Evergreen Pine Jelly Soap. The oil seemed to work. However, after the merchandise was out on the dealers' shelves, it would get about two inches of water on the top which made it absolutely unsalable. The result was that we have had to bring back approximately 6,000 cases now with much more which is coming in every day. This is not to mention the damage which has been done to our product from the consumers' angle.

"This has been a most terrific blow to us and has cost us a most substantial sum which has almost ruined us financially. The cost is almost unmeasurable and we certainly feel that Emery Industries, Inc. should do something about this as we bought the 0442 with the understanding that it would do our job just as well. We,

however, will never use any other product but Olive Elaine and if it is not obtainable we will not produce our product.

"We are not in a position to stand this great loss and are asking you just what you might do to help us out as we will continue to do business with you even though you feel that you do not want to help us at the present time. If we were financially able to stand this loss, we would certainly not present it to you. However, we feel Emery Industries, Inc. are in better position than we are at the present, to stand such a most substantial loss.

"Awaiting your reply, we remain
Yours very truly,
Murphy Laboratories, Inc.
John W. Murphy."
John W. Murphy."

18. The separation in plaintiff's product was not due to any defect in 0-442.

19. Plaintiff is indebted to defendant for the unpaid balance of the purchase price of 0-442, delivered by defendant to plaintiff by invoice dated February 7, 1947, in the sum of $6,412.40 with interest.

## Discussion

Plaintiff seems, in the first instance, to base its claim here on an alleged warranty made to it by defendant's salesman Ritz, that the oleic acid known as 0-442 sold by defendant to plaintiff for use in the manufacture of its pine jelly soap was the same as the oleic acid known as 0-20 previously sold by defendant to plaintiff, and further that the 0-442 would give satisfactory results; secondly, on the contention that its difficulty here resulted from the fact that 0-442 had a lower titer value than 0-20. Titer value means the number of degrees of temperature above zero centigrade at which the solids in the acid begin to solidify.

There was a wide divergence of opinion here on the importance of the titer value of the oleic acid in the manufacture of this soap. Murphy attaches great importance to it, as it does incidentally to the iodine content in the acid, and attempts to weave into the picture a warranty by Emery, through its agent Ritz, that the substituted

0–442 had an equivalent titer value of the tried, tested, and approved 0–20. However, Murphy frankly admits that Ritz had no knowledge of its formula, and it is readily agreed that 0–442 was brought into the picture by means of a small trial order and that this trial order was followed by a further order of a tank car of 8000 gallons. There is no contention here that the larger amounts subsequently ordered differed in any particular from the first trial order. Section 16 of the Sales Act of 1915, P.L. 543, 69 P.S.Pa. § 125, provides that in the case of a contract to sell or a sale by sample, the implied warranty is only that the bulk shall correspond with the sample in quality. Obviously, under the circumstances, there is no violation of such implied warranty here. Nor, in the light of the testimony, can we find any evidence of an express warranty.

I do not think the evidence supported plaintiff's contention that the cause of the separation in the soap resulting in a watery sediment at the top of the containers, was due to a difference in the titer value of 0–442 from 0–20, or a difference in the iodine content of the two acids. The fact of the matter is that plaintiff was able to get satisfactory results from a blending of 0–20 with various other acids; that apparently the first use of 0–442 produced satisfactory results. It is significant that about the time the trouble developed plaintiff was enjoying its largest volume of business and at the same time its employee, Rees, who had been doing the actual soap making for Murphy, left, making it necessary for Murphy to break in new men for that purpose. It was agreed by plaintiff's witnesses that if there was too much water in the formula it would make the soap bleed regardless of any question of titer or iodine value. Consequently, from a careful analysis of all the testimony in this case, I find myself coming to the inescapable conclusion that here the difficulty was not titer or iodine but water and with that the defendant had nothing to do.

However, even though assuming that a warranty such as that claimed by Murphy was given, did it on discovery that the goods in question, i. e. the 0–442, were not as warranted, give notice thereof to Emery as required by the Uniform Sales Act? Section 49 of the Uniform Sales Act in force in Pennsylvania, Act of May 19, 1915, P.L. 543, 69 P.S. § 259, provides: "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty, within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor."

The trial order was placed in September 1946, the order for the 8000 gallon tank car was placed in October 1946. About thirty to sixty days after first using 0–442 Murphy started receiving complaints. It continued using 0–442 despite the complaints and without, at any time, taking the precaution to have an analysis made of the one new ingredient in its product until March 1947, even though in its brief plaintiff states: "The Titer Value of an Oleic Acid is not something that can be seen, smelled or tasted. *It can only be determined by a complicated chemical analysis.*" (Emphasis supplied).

According to the testimony of J. W. Murphy, an officer of the plaintiff corporation, he did nothing until he discovered, as the result of a telephone conversation with Ritz on February 15, 1947, that 0–442 had a lower titer value than 0–20; that he then immediately knew what was wrong. Four weeks later, on March 13, 1947, Murphy wrote to Emery, not complaining but apologizing for the delay in paying its bill and giving as a reason therefor that it was overstocked. Then on April 15, 1947, and again on April 30, 1947, they made payments on account of their indebtedness.

Murphy testified that after he first had separation he had a number of conversations with Ritz in relation thereto, up to May 1947. Ritz, on the other hand, testified that he had no conversations with

Murphy concerning the separation and that the first complaint he had was on April 28, 1947. The testimony is certainly devoid of any clean cut formal complaint prior to April 28, 1947, and that date loses most of its significance in view of the fact that two days later plaintiff made a payment on account.

In Bomze v. M. Schwarz Textile Corp., 100 Pa.Super. 588, the plaintiff bought a certain red broadcloth represented to have a fast color which would not run. A 5 yard piece of the broadcloth was first bought and shortly thereafter 64 yards more were bought, the latter being delivered on January 8. He made no test but immediately began using it. On February 4, he discovered that the color of the broadcloth was not fast but was running and spoiling the product. He gave immediate notice to defendant of the alleged breach of warranty, giving as his reason for not testing the material that he had no trouble with the 5 yard piece. In reversing a judgment for plaintiff and entering it in favor of defendant, the court said: 100 Pa. Super. at page 592.

"Under the evidence in this case, the buyer accepted the goods. Having accepted them, he could only hold the seller liable for breach of warranty by giving notice of the breach 'within a reasonable time after the buyer knows or ought to know of such breach.' Out of that provision, which is declaratory of the common law founded on business practice, grows *the buyer's duty to inspect or test the goods within a reasonable time to determine whether they comply with the warranty.* Performance of that duty is important to the seller. It is the plaintiff's own evidence that he did not perform that duty; that he made no inspection or test until more than three weeks after he had cut them up, notwithstanding that he testified to two simple methods of determining whether the color was fast. * * *" (Emphasis supplied.)

In Tinius Olsen Testing Machine Co. v. Wolf Co., 297 Pa. 153, 146 A. 541, 72 A.L.R. 718, in which the sale of certain machinery was involved, plaintiff-seller sent its engineer to defendant's plant to check on its requirements and recommended a certain type of machine, which it guaranteed would do certain work in an economical fashion. The machine was set up in defendant's plant on August 31. Defendant tried to make it work satisfactorily until September 28, when it gave notice to plaintiff of its election to rescind the contract for breach of warranty. Plaintiff sued for the purchase price. In affirming a judgment for plaintiff upon the ground that defendant had failed to give prompt notice of the alleged breach of warranty, the Supreme Court said, 297 Pa. at page 158, 146 A. at page 542:

"In determining the question, the court below found the following express warranty had been made and breached: 'That all that was required to do was to put the appliance on a machine and it would indicate the amount and location of unbalance.' When plaintiff's engineer demonstrated the machine on August 31, 1926, defendant then knew that this warranty had failed, and the machine would not indicate the amount of unbalance without calculation and use of a chart. It waited a month before giving notice. The lower court held this was an unreasonable time, and we concur in its conclusion. If defendant wanted to rescind, it should have acted promptly. The vendor was entitled to this knowledge, as a matter of business, and the breach was one that was immediately discoverable. It was not necessary to specify in the notice of rescission this specific breach of warranty. *A notice of rescission must be clear and unambiguous, conveying an unquestionable purpose to terminate the contract.* Where, from the conduct of the one having the right to rescind, it is not clear whether he has rescinded the contract or not, he will be deemed not to have done so. Wright v. Bristol Patent Leather Co., 257 Pa. 552, 556, 101 A. 844; 2 Black on Rescission of Contracts [vol. 2], § 574. * * *"[1] (Emphasis supplied).

[1] See also Truscon Steel Company v. Fuhrmann & Schmidt Brewing Company, 327 Pa. 10, 192 A. 679.

656

In Comfort Springs Corporation v. Allancraft Furniture Shop, Inc., 165 Pa.Super. 303, at page 306, 67 A.2d 818, 820, very similar to the instant case, the court said: "* * * In one letter, (March 4, 1947, nearly two months after delivery) the buyer made no complaint about the quality of the goods and in the other (March 21, 1947, six days before the attempted rescission) the appellant-buyer expressed appreciation for past cooperation and requested indulgence for a short time longer to make payment. The difficulty with appellant's position therefore is that his proofs are vague, indefinite or incompetent, and utterly fail to substantiate any waiver of rights on the part of the seller. * * *"

There is certainly nothing in the facts developed before me in this case to indicate the prompt and unequivocal notice required by the Sales Act.

Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter of this action.

2. No warranty, expressed or implied, was given that Emery 0–422 was the same as Emery 0–20, or that it would make satisfactory pine jelly soap when used in a formula, which plaintiff admits the defendant did not know.

3. The cause of the separation of the plaintiff's soap was not the titer value of or any defect in Emery 0–442.

4. When the plaintiff discovered or should have discovered what it claims was a breach of the defendant's alleged warranty, it failed to give to the defendant the prompt and unequivocal notice required by the Sales Act of 1915.

5. Under the terms of the invoice the account drew interest from thirty days after date of invoice, which would be March 9, 1947.[2]

6. The defendant is entitled to judgment in its favor upon the plaintiff's claim, and to a judgment against the plaintiff in the amount of $6,412.40, with interest from March 9, 1947.

Counsel for defendant will tender appropriate decree for entry.

2. Harding, Whitman & Co. v. York Knitting Mills, C.C.M.D.Pa., 142 F. 228.